Good morning, your honors. Good morning. May it please the court, Maziar Razia on behalf of the appellant, Mr. Rodas. The issue here is whether the BIA erred in finding Mr. Rodas mere membership as a low-level officer in a legitimate law enforcement organization from April 1986 to October of 1988, carrying out traditional law enforcement duties makes him a persecutor. We respectfully submit that the board erred as a matter of law because it failed to apply the Supreme Court's rationale and this court's well-established two-part test enunciated in Miranda Alvarado v. Gonzalez and its progeny, including Kumar v. Holder, that the persecutor bar requires a particularized evaluation of both personal involvement and purposeful material assistance that has a causal nexus to actual instances of persecution on account of an enumerated ground. The board also failed to follow Wikimorovic v. Ashcroft and its own precedents, that holding that mere membership in an organization, even one which engages in persecution, is not sufficient to bar one from relief. There it noted that although such membership could signal support for the persecutorial aims of others, it does not suffice. Standing alone to establish the requisite personal assistance or participation in a blanket exclusion on those who come from places beset by civil war and are affiliated in some respect with one side or the other. But this isn't just a general claim. I mean, the contention, as I understand it, is that he arrested people knowing that if he turned them over to the jailers, that they would be mistreated and potentially tortured. And that that happened with some of the people that he arrested and turned over. Why would that not be sufficient to make him a persecutor? Actually, at least to assist in persecution. So actually, if you look at page 91 of the record, Judge, they asked him, he went on to clarify, and I'm going to read straight from the record. And when you arrested somebody, did you know for certain what was going to happen to them? And he answered, no. This is on page 91. And also during, in page 851 of the record, the memo from the asylum officer who actually interviewed him on the last sentence, he stated that, this is the asylum officer, he stated that he did not know what happened to these people that were arrested. Were there other comments that he was cross-examined with where he said that he was aware that bad things happened? He did indicate there were some rumors. This was during civil war in Guatemala. So he said there were some rumors that there were some people that were being mistreated in prisons. So he did indicate there were some information out there that he may have known about. Counsel, on the record at page 75, so AR 75, he was asked by the IJ, how do you know there were guerrillas in the crowd? How would you know that? And Rodas responds, the rallies was against the government, the guerrillas, those were during the confrontations. It's a little bit of a leading question by the IJ, but he seems to accept the premise that he understood that during the confrontations, when he said that he did push some people and had to arrest at least three people in the confrontations, that he was aware that some of those in those confrontations were guerrillas. And they would have taken those people and put them in their own holding cell, and then eventually they were transferred to the army. But he absolutely indicated he would not arrest somebody just because there were guerrillas. I mean, that's in the record. No, he was aware that there were people in these crowds that were guerrillas and that were in the army. He said, yes, but he indicated that he never arrested somebody just because there were guerrillas. He arrested people that were breaking glass, and I think he said three people he actually arrested throughout his whole career. What does the record say about the three to five people that he arrested at rallies? Does it say whether any of those were guerrillas? Yes. He actually, it's on page 91 where he talks about that. He never arrested anybody who did not break the law, and he also indicated that, and this is on page 91, he also indicated that no one arrested that he arrested was ever harmed as far as he knew. And on page 64, actually, if you look at 64, he said he never arrested guerrilla members. They asked him point blank. How would he know that? Because he didn't know. He arrested people. I guess you never know if you're arresting somebody. I mean, that's a question that you can never know who you're arresting. He only arrested people who were breaking the law, actually doing something unlawful based on traditional police conduct. So I don't think, and I don't really think that the government is even arguing that he personally ever harmed anybody because of their, on a persecutory ground. He was not present during any alleged acts of persecution. He had no role after the people were detained. He was a low-level police officer doing his job. And during the Civil War, I mean, what the board is doing here is a theory of guilt by association, basically. You're associated with this group, which they have on page 1157, talks about the Hacienda police, which is actually pretty interesting because the Hacienda police has been around since 1954. And obviously it wasn't mistreating people throughout its history for the past 80 years. What year was his father killed? I couldn't tell. I think it was in the 80s. 1984, maybe? Yes, it was in the 80s. He was ambiguous about the date, but I think it could have been as early as 84. He joins the Guardia de Hacienda in 1986. So it's two years, possibly as late as two years after his father's death. That's correct. Is there any information in the record as to how or why, how he obtained this job or why he decided to apply for this position? I mean, it's more than, surely it is more than coincidental that he joined the force that his father had belonged to, knowing that his father had been killed by guerrillas while in the employ of the Guardia. I believe, I think he indicated just it was a job that paid. And also the Hacienda police was divided into different units. There was a special intelligence unit up here, and this is based on the government's evidence. The intelligence unit was made up of former military members who were involved in some abductions and assassinations outside of time, mostly outside the time and the place where the appellant was stationed. He was stationed in Guatemala City and their information on 1172 says there were no actual abductions or any sort of assassinations occurring in that area. And he was certainly not part of that intelligence unit within the organization that was involved in this kind of conduct, persecutory conduct. So, he wasn't in the place, he wasn't at the time. He certainly didn't do anything that would cause him to, that would indicate any persecutory intent or motive. So, it's based on guilt by association. You're in this organization, you automatically assume that you are a persecutor. And that's what this court has time and again said is not appropriate in these types of cases. Well, forgive me for oversimplifying, but if the organization did engage in persecution of the guerrillas, he made arrests. He did not knowingly, apparently, arrest guerrillas, but he knew that if he did, they would be tortured or persecuted. So, you have a finding that he assisted in the persecution. Why does the record compel a conclusion to the contrary? Because if that's the standard, Your Honor, then almost anyone, any law enforcement officer, anywhere in the world, practically, will be deemed a persecutor. Officer in Egypt, automatically. Officer in Iraq, he goes and arrests somebody for burglary, turns them over to the authorities, they find out he's Sunni, they torture him. CNN journalist goes to Iran, interviews a Washington Post journalist who's stationed there, asks him some politically sensitive questions, airs that report. The gentleman ends up in jail in Iran for two years and then tortured in jail. So, under that standard, almost anyone could be deemed in assisting in persecution. It could include, I mean, it's mind-boggling, frankly, if that's the standard because there is actually, there is an Australian techie right now who has the internet, all the social media groups, all the social media sites that has gathered almost 3 billion faces and by using this app, you can identify the person by their image, with their name, where they live, what they do. If that app gets into the hands of the people, then they're persecutors. Then the app developer is a persecutor under that rationale because he assisted, knowingly assisted, knowing that this technology can be used to actually identify protesters, put them in jail, and torture. I think that would be a very dangerous precedent to be setting at this point, if that's the standard. If the person knows or should have known that this technology could be used for some bad purpose. Unless I have any other questions, I'm going to preserve my time. Your time. Thank you. All right. Thank you, Dan. Good morning. May it please the court. My name is Paul Stone. I represent the Respondent Attorney General of the United States. The primary issue for decision here today is whether or not the persecutor or bar applies to Mr. Rodas to prevent him from applying for NACARA cancellation and cancellation of removals, relief from deportation. This case involves a lot of people. One, admittedly, was a member of the Treasury Police, an organization which was notorious for human rights violations in the 1980s. He admitted that he was involved, that he arrested political protesters at protests, that he turned them over to others who he knew beat and killed them. Now, the- Well, now, what does the record say about the treatment of the three to five people that he said that he arrested at political protests? What he said, and he said it in a number of different ways and different times. One of the better statements is at page 84 and 85 of the record where he conceded that his statement that the people were arrested were beaten and tortured. He said they would get arrested and we would turn them over and he would hear about it. He would hear about them being killed, but he never saw it. So he heard about it but didn't see it in person. This is on cross-examination concerning the statements he had made to the asylum officers. Is that correct? That's correct, Your Honor. And in that statement of what he had made to the asylum officer, he distinguished between the people that he arrested and guerrillas who were arrested by others. And it seemed from- the notes are difficult to read, but it seemed like the comment was about the guerrillas and not the people that he arrested and this cross was sort of mushing these two things together. Well, it may have been, but that's what he responded to. There's another more clear statement on page 87. But he says they would get arrested, we'd turn them over. Yeah, we, Your Honor. He did concede that it was we. He also said on page 87, where he was asked also about this interview, he said, sir, do you remember telling the asylum officer that you knew these people would be beaten and killed, but you had to turn them over anyway because it was part of your job? And he responded, yes. And the ICE attorney asked again, you remember saying that? And he said, yes. He went on to say later on that he never actually saw them being beaten or killed. But that's not a requirement for assisting in persecution. What's required for assisting in persecution is doing an act that in some way facilitates the persecution, even if someone else commits it. In this case, he arrested the people, he turned them over. If he hadn't done that, those people wouldn't have been at risk of persecution. But you agree that in order to find that the persecutor bar applies, it has to be the case that someone that he arrested is then persecuted, not just that he arrests people and some other group of people happen to be persecuted and there's no match between those two. No, I think there does have to be a match between the two, Your Honor. But I think there's also to raise the inference that the bar may apply, which is there's a two part test we haven't talked about here first, which is if there's evidence indicating the bar may apply, then he actually has the burden to show it doesn't. So the evidence indicating the bar may apply may not have direct specific evidence showing that a particular person he turned over was killed. But certainly based on his testimony, it's evidence from which a trier fact could infer that the bar may apply, giving him then the burden to show that it doesn't. So then he would have had to show that the people who were turned over did not in fact get. Yes, exactly, Your Honor. But he just simply denied ever finding out what happened to them, which, you know, honestly, Your Honor, is of some concern. We don't want people arresting others, turn them over, knowing they may be tortured. So suppose, you know, someone lives in a dangerous part of Guatemala where the police are notoriously corrupt and abusive, but someone's breaking in their house and they call the police to say, you know, someone's breaking in the house, you've got to take them away. And they take them away and they do what, you know, everyone suspects that they would do. Is that person now a persecutor and barred if they later come to the U.S. and claim asylum? Well, that's obviously a different case than we have here. That sounds a bit like Vuk Marovic, in which the court found that pure self-defense doesn't constitute persecution, and that may be the way in which the person was defending themselves. They're breaking into my neighbor's house. Are they then a persecutor? That, again, is more problematic. But, again, that's defense of others. I'm not as familiar with criminal law as I am with immigration law. But I know there are, if I recall correctly from many years ago, you're permitted to defend others. But if they're throwing bricks through windows and smashing things, then because now you're a cop, now you can't, you're a persecutor if you stop them from doing that. Well, Your Honor, if you are arresting people, turning them over, knowing they may be beaten or killed, you shouldn't have that job. And this country is not obligated to extend largesse of permanent residence or even citizenship here to people who do that. And Congress has made the decision that it does not want to permit people who actually create other refugees from coming here and seeking, for example, refugee status. If you persecute someone on account of a protected ground, that person can seek refugee status here. That would be extraordinarily ironic to allow the actual persecutor to come and obtain asylum. Well, I'm still not quite understanding what you do with the passage. I guess it's at ER 857. He was asked, did you ever apprehend any people? He said, I have detained people with drugs in cars a couple of times. Did your unit ever capture guerrillas? Yes, my unit did, but I never did. Only the military would capture them. What would happen to the people? I do not know. They would be in the hands of the Army. Do you have any idea as to what happened to the prisoners? They would get tortured, and also if the guerrillas captured one of us, they would do the same. Did you ever harm anyone? No. So as I read that, some other unit was doing this. And that seems to be separating him from the folks who were doing the torturing. Well, I think, Your Honor, I think that's because this group, the Treasury Guard, was notorious for committing human rights violations, so I have no doubt that he was speaking about others as well in that passage. What's important is that he did admit in immigration court that it was me, or we, that was involved in some of these activities. That almost illegible piece of paper there? Yeah, that no one put any weight in. Does it make a difference whether it's me or we, though? No, Your Honor, because if it's a we, then that's part of the assisting. If it's me, it can also be assisting. So that's not a particular – that doesn't necessarily make a difference here. One thing I'd like to address is he talked about how he didn't have the intent that when he arrested these people that they actually be persecuted on account of protected ground. I sent in a 28-J letter on the New First Circuit case of Alvarado that parsed the language and explained that the persecutor bar doesn't require the person assisting in the persecution to share in the actual motive of those who are inflicting the harm. The Seventh Circuit has said something similar in the Singh case, the Fifth Circuit in the Baugh case. But they have to know that the harm is going to be inflicted. Exactly, Your Honor. It's not – they don't have to share that intent. It would create a bizarre loophole in providing for things like the defense of just following orders. Unless the panel has any additional questions, I think I'm finished. Okay. So thank you for your time. Thank you, counsel. Just briefly, Your Honors. On page 91 of the record, Judge asks, and when you arrested somebody, did you know for certain what was going to happen to that person? He responded no. The trick there in that sentence is the word for certain. Right. So that's – We may have suspected. We may have strongly suspected, but we didn't know for certain. The answer is so capacious that it's just not sure what it means. Right. But the government's argument is that now the motive, the persecutory motive is – it really doesn't matter what he thought. That's their argument based on these new cases. We're going to impute the person, the actual persecutor's motives on you regardless of what your intentions were, what your culpability is. That is a dangerous precedent right there because if you do that, imagine the situation in their cases that they cite from the BIA. You have somebody in Serbia during the Bosnian genocide where the police officer goes and rounds up 200 Muslim men, and they are executed. If you change that scenario and let's make it into Philippines, for example, you have a bad cop who goes out and arrests 200 people based on their religion, Muslims or any sort of minority, any sort of religious minority, and turns them over under drug, like drug under air codes, drug charges. They're executed or they're tortured, but the police officer who actually committed the act is all free, scot-free. He's not a persecutor because his intent, his motives are irrelevant based on their rationale. It's the persecutory event of the actual person who commits it. So under that rationale, it's absurd. Let me just say about the burden shifting. We do the whole case before the immigration judge. It's all done. We have the asylum officer testify, and this is on page 197 of the record. And this is what the court said. The court is not satisfied based on the testimony and the officer's confirmance that the respondent always said he never personally harmed anyone, that just being in that group is not ipso facto a persecutor. That was the immigration judge's initial tentative ruling. So there was no burden shifting. Once we did the case, he said, I don't find persecution here. And then he decides, I guess, that he did. I guess I'm not quite understanding your position here. If you're a member of a group making arrests, and you know that some people who are arrested are going to be tortured or persecuted, and you nevertheless continue to make the arrests and turn them over, knowing that, you are not assisting in the persecution? Sure you are. Yeah. Sure you are. The difference between that case and this one. As long as you have the motivation. No, no, you say motivation. It seems to me that if you know that what you're doing is going to cause this, you're helping, whether you personally intend or want them to be persecuted or not. But see, the conduct informs the motive, right? That's what that scenario that I brought up with the Philippines is. The conduct informs the intent, the motive. If you are going out and you're actually arresting people because of their race or religion, and you turn them over when you know they're going to be tortured, then yeah, you should be deemed a persecutor. But we don't have that here, obviously. I mean, this is not what happened here in this case. And you have to look at the actual person's conduct. What happened in this case, how is it different? First of all, nobody that he actually, there's no nexus, number one. There's no, he may or may have heard something, but he didn't actually know what was going to happen to these people, according to the record. Did he arrest any political protesters? No, he arrested them because they had broken the law, not just because they were political protesters. They were breaking glass. What if somebody, what if, and I know I'm out of time, but if I could just go through this real quick. Thank you very much. Imagine a police officer, police chief in Hong Kong right now. So a student protestor is arrested for throwing a Molotov cocktail, right? He goes to the station, and the police chief does the right thing. He just does a police report, police report just like you would, and he releases the guy. He goes, go home. Then the Chinese intelligence officers come by, and they go over the police reports, and they find the information on this guy. They go out and arrest him and torture or detain him for whatever. Under the government scenario, the police chief is a persecutor for doing his job, putting out police report, releasing the person. He should have known that maybe they're going to go through the reports and go eventually find this guy and arrest him. Thank you. The case just argued will be submitted.
judges: Schroeder, Bybee, Collins